# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

WESTERN WATERSHEDS PROJECT
and WILDEARTH GUARDIANS,

                Plaintiffs,

     v.

U.S. FOREST SERVICE,

                Defendant.

Case No. 1:17-CV-434-CWD

**MEMORANDUM DECISION AND ORDER ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION OR TRO (DKT 3)**

## INTRODUCTION

Pending before the Court is an emergency motion for a preliminary injunction or temporary restraining order filed by Plaintiffs Western Watersheds Project ("WWP") and Wildearth Guardians ("Guardians") against Defendant United States Forest Service ("Forest Service"). (Dkt. 3.) The Court is considering the motion as a motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). The parties had fair opportunity to provide full briefing supported by affidavits.[1] Moreover, the standard for issuing a preliminary injunction is virtually identical to the standard for issuing a temporary restraining order. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*,

---

[1] The Court also reviewed and considered much of the material submitted by the parties after the November 15, 2017 hearing. (Dkts. 26-27.) The Court agrees with Plaintiffs (Dkt. 27) that some of the information submitted with Defendant's Sur Reply (Dkt. 26) went beyond the Court's request. However, Plaintiffs will be provided with an opportunity to reply further if required in connection with future proceedings in this matter.

887 F. Supp. 1320, 1323 (N.D. Cal. 1995). The parties filed responsive briefing, and the Court conducted a hearing on November 15, 2017, at which the parties appeared and presented their arguments.[2] After carefully considering those arguments, the parties' written memoranda, exhibits, and relevant case law, for the reasons that follow, the Court will grant the motion.

## STANDARDS OF REVIEW

### A. Standard of Review for a Preliminary Injunction

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). It is not an adjudication on the merits, "but a device for preserving the status quo and preventing irreparable loss of rights before a judgment." *Idaho Rivers United v. Probert*, No. 3:16-CV-00102-CWD, 2016 WL 2757690, at *6 (D. Idaho May 12, 2016). A plaintiff seeking preliminary injunctive relief must establish (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities is in plaintiff's favor; and (4) that the injunction is in the public interest. *Winter* at 7. The plaintiff must show suffering irreparable harm is likely, and not a just a possibility. *Id.* A court must consider each factor and balance the parties' competing claims of injury by considering the potential effects of the injunction on each party. In the United State Court of Appeals for the Ninth Circuit, issuance of a

---

[2] The undersigned United States Magistrate Judge has jurisdiction over this matter by virtue of all parties' express written consent. 28 U.S.C. § 636(c); *see also* D. Idaho Loc. Civ. R. 72.1(a)(1) (authorization to decide civil cases with the parties' consent). (Dkt. 16.)

preliminary injunction is favored when the merits analysis and hardship balance both tip strongly toward the plaintiff, so long as the plaintiff shows also that there is "a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

   B.  *Standard of Review of a Final Agency Action*

   Courts review final agency actions under the Administrative Procedure Act (APA). According to the APA, courts must review such final agency actions under the "arbitrary and capricious" standard. *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000). A court must determine if the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998) (quoting the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)). The APA standard dictates that the reviewing court set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The party challenging an agency's action as arbitrary and capricious bears the burden of proof." *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1174 (D. Idaho 2013) (citing *WildEarth Guardians v. Salazar*, 741 F.Supp.2d 89, 97 (D.D.C. 2010)).

   A court may reverse the agency's decision as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Cascadia Wildlands v. Bureau of*

*Indian Affairs*, 801 F.3d 1105, 1110 (9th Cir. 2015). While the standard under the APA is narrow, the reviewing court must still conduct a "substantial inquiry" and "a thorough, probing, in-depth review," to determine whether "the agency present[ed] a rational connection between the facts found and the conclusions made." *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009) (internal citations omitted). The Forest Service's action of issuing the 2017 AOIs authorizing domestic sheep grazing on the Snakey and Kelly Canyon allotments will be reviewed according to the APA standard for final agency actions for both the NEPA and the NFMA claims. The standards for each type of claim are set forth below.

### i. *National Environmental Policy Act*

NEPA was designed to set forth a "national policy which will encourage productive and enjoyable harmony between man and his environment ... [and] promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." *Metcalf v. Daley, 214 F.3d 1135, 1141–42* (9th Cir. 2000) (quoting 42 U.S.C.A. § 4321 (1994)). NEPA and its accompanying regulations require agencies to complete an Environmental Impact Statement ("EIS") before making any irreversible or irretrievable commitment of resources. *W. Watersheds Project v. Bureau of Land Mgmt.*, No. CIV. 09-0507-E-BLW, 2009 WL 3335365, at *6 (D. Idaho Oct. 14, 2009). This requirement is meant to prevent agencies from doing damage before considering the effects of their actions. *Id.*

NEPA's requirements are not substantive. Instead, NEPA establishes "action-forcing" procedures requiring agencies to make a "hard look" at the environmental

consequences of proposed actions. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). These "hard look" assessments need to be made "early enough" to practically serve as a meaningful contribution to the decision-making process. *Id.* at 718 (quoting 40 C.F.R. § 1502.5 (1987)). In other words, the agency must make a hard look assessment "at the earliest possible time to insure that planning and decisions reflect environmental values." *Andrus v. Sierra Club*, 442 U.S. 347, 351, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); *see also* 40 C.F.R. § 1501.2 (1999).

The issuance of Annual Operating Instructions (AOIs) by the Forest Service to grazing permit holders is a final agency action. *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006). Thus, the Forest Service was required to complete an EIS prior to issuing the 2017 AOIs for the Snakey and Kelly Canyon allotments. However, in 1995 and in legislation thereafter, Congress enacted a series of riders allowing, in some instances, for the NEPA process to be completed after the re-issuance of expired or expiring grazing permits. The riders are now codified within the Federal Land Policy and Management Act ("FLPMA"). These riders may affect the viability of the Plaintiffs' NEPA claims in this matter.

### ii. *National Forest Management Act*

The National Forest Management Act ("NFMA") creates a management framework for national forests. The framework is divided into a two-step process. First, the Forest Service must develop a Land Resource Management Plan and an EIS for the entire forest. 36 C.F.R. § 219.10(a), (b); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). Second, once a forest plan is created, site-

specific projects require assessment by the Forest Service. Any action taken by the Forest Service must be consistent with the applicable forest plan. NEPA overlays the NFMA requirements. For example, whether an EIS needs to be prepared, and the process by which an EIS is prepared, i.e. the "hard look" requirement, is dictated by NEPA. *See* 40 C.F.R. Part 1501 *et seq*; *Cuddy* at 1376. However, unlike NEPA, NFMA imposes substantive requirements at each step. These include requirements insuring biological diversity of plants and animals and managing for the viability of sensitive species within the forest.

## PROCEDURAL BACKGROUND

WWP and Guardians seek to have the Court enjoin grazing of domestic sheep on the Snakey and Kelly Canyon allotments (the "allotments") in the Caribou-Targhee National Forest (the "Forest"). The Forest Service authorized the grazing through issuance of an annual temporary grazing permit in June of 2017 and corresponding Authorized Operating Instructions ("AOIs"). The documents were issued to the United States Department of Agriculture ("USDA"), Agricultural Research Service ("ARS"), for the benefit of the United States Sheep Experiment Station ("Sheep Station") in Dubois, Idaho. ARS is the USDA's chief scientific in-house research agency.[3] The fall grazing season was set to begin on November 6, 2017. However, in light of Plaintiffs' motion, the

---

[3] UNITED STATES DEPARTMENT OF AGRICULTURE AGRICULTURAL RESEARCH SERVICE, *ARS Home, About ARS*, https://www.ars.usda.gov/about-ars/ (last visited Nov. 20, 2017) (Court's Exhibit 1).

Forest Service agreed to delay turnout of the sheep on both allotments until November 21, 2017.

Plaintiffs argue that grazing domestic sheep on the allotments poses a grave risk to the nearby South Beaverhead bighorn sheep population. The risk to bighorns arises from the potential for the transmission of pneumonia pathogens from domestic sheep to bighorn sheep when the two species are in close proximity.

Plaintiffs bring two claims for relief in their Complaint. (Dkt. 1.) First, they claim the Forest Service violated NEPA by issuing the September 2017 AOIs prior to completing and publishing its EIS on the impacts of domestic sheep grazing on the bighorn sheep. Second, Plaintiffs allege that authorizing the grazing is inconsistent with the direction set forth in the 1997 Revised Forest Plan for the Targhee National Forest ("Forest Plan"), and thus is also a violation of NFMA.

Plaintiffs claim the Forest Service failed to close the two allotments as required by the Forest Plan. They allege the Forest Plan requires closure when an opportunity arises—opportunity is defined as "a suitable or favorable time." The most recent interagency agreement between the Forest Service and ARS for the Sheep Station expired at the close of 2016. Plaintiffs claim the expiration of that agreement was "an opportunity" under the Forest Plan for the Forest Service to close the allotments. Instead, in early February of 2017, the parties renewed the agreement for five additional years. (2017 Interagency Agreement, Dkt. 19-3.) The February 2017 agreement specifically provides, in Section III(c), that the Forest Service shall "[i]ssue an annual Livestock

Grazing Permit to ARS to authorize sheep grazing on NFS lands each season." (Dkt. 19-3 at 3.)

In their Complaint, Plaintiffs further allege the Forest Service's decision to issue the grazing permit and corresponding AOIs is not supported by this Court's precedent. (Dkt. 1.) They cite numerous decisions where this Court either approved of a closure or ordered closure of Forest Service or BLM managed allotments due to the same risk of disease transmission.[4]

Finally, Plaintiffs argue the public has a "great interest in preserving [this] iconic western species that so many people value, including hunters, recreationalists, and wildlife enthusiasts." (Dkt. 3-1 at 21.) And, that closing the allotments will cause "very little hardship to the Forest Service or the Sheep Station." *Id*. Plaintiffs claim the Forest Service will actually benefit, due to cost savings (the Sheep Station pays no fee for the grazing rights). As to the Sheep Station, the Plaintiffs argue that, because the Sheep Station does not use the allotments specifically for research (but to support research it does on other lands), and because it cannot graze the allotments in high snow years, the use is not critical. Plaintiffs further allege the Sheep Station has been on the

---

[4] *Western Watersheds Project et al. v U.S. Forest Serv.*, 2007 WL 1729734, No. 4:07-cv-151-BLW (D. Idaho, June 13, 2007) (approving closure of Smith Mountain allotment); *Western Watersheds Project et al. v. U.S. Forest Serv.*, 2007 WL 3407679, No. 4:07-cv-151-BLW (D. Idaho, Nov. 13, 2007) (approving closure of Allison-Berg allotment); *Western Watersheds Project et al. v. BLM*, 2009 WL 3335365, No. 4:09-cv-507-BLW (D. Idaho, October 14, 2009) (ordering closure of Partridge Creek allotment); *Western Watersheds Project et al. v. U.S. Forest Serv.*, 2012 WL 2254206, No. 1:12-cv-286-BLW, ECF #16-17 (D. Idaho, June 15, 2012) (ordering Forest Service to withdraw grazing authorizations and implement direction closing allotments on Payette National Forest); *Idaho Wool Growers Ass'n et al. v. Vilsack et al.*, 7 F. Supp. 3d 1085 (D. Idaho 2014) (approving Forest Service decision to close allotments on Payette National Forest), aff'd 816 F.3d 1095 (9th Cir. 2016).

government's chopping block for years because it fails to provide a significant return of value in relation to the cost of running it each year.

In response, the Forest Service argues the issuance of the grazing permit prior to completion of the EIS is not unlawful, and was approved by Plaintiff WWP as a party to a 2013 settlement agreement regarding grazing domestic sheep in the area that includes these two allotments, among others. The Forest Service alleges the settlement agreement expressly provides that grazing may continue on the Snakey and Kelly Canyon allotments until the EIS is complete.

The Forest Service further argues that the issuance of the permits is actually required by law—claiming the Federal Land Policy and Management Act (FLPMA) requires the reissuance of permits until the necessary environmental analysis is complete.[5] In 1995, Congress enacted riders to an appropriations bill that were eventually recodified within FLPMA. The provisions were created because so many grazing allotments were coming up for renewal and required NEPA analysis. Congress enacted the laws to ease the administrative burden on the Forest Service and BLM, and to prevent unfairness to permit holders who otherwise would have to wait for review to continue grazing. The statute allows for continuation of expired or terminated permits under new permits with the same terms and conditions of the last permit pending required environmental analyses. 43 U.S.C. § 1752 (c)(2). However, the application of this

---

[5] Federal Land Policy and Management Act, 43 U.S.C. § 1752 (Grazing Leases and Permits). The provisions of the 1995 Rescissions Act and subsequent appropriations and omnibus riders are recodified in this section of FLPMA.

provision is subject to dispute in case law.[6] The Forest Service alleges the provision applies not only to NEPA, but to "all other applicable" laws requiring up-front environmental analysis—such as NFMA.

Finally, the Forest Service alleges it is in compliance with the Forest Plan because it has acted to limit domestic sheep grazing within the Forest and within the allotments at issue. The Forest Service argues it is acting consistently with the Forest Plan by maintaining the viability of the bighorn populations Forest-wide. It asserts that, even if the domestic sheep grazing does result in the South Beaverhead population dying-off due to pneumonia outbreak, it nevertheless is and will maintain compliance due to the health of the bighorn populations Forest-wide.

Likewise, the Forest Service acknowledges it is possible that the South Beaverhead bighorn population could be exposed to the pneumonia pathogen from the grazing domestic sheep. However, it argues that a *possibility* does not warrant an injunction—and that Plaintiffs instead must show the result is *likely* to occur. The Sheep Station has been grazing the allotments for decades.[7] The Forest Service points out that, in all that time, the small population of bighorns has not been extirpated. And, as mentioned above, the Forest Service argues also that extirpation of the small herd would

---

[6] *Or. Natural Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889, 922023 (D. Or. 2012); *W. Watersheds Project v. BLM*, No. 4:07-cv-151-BLW, ECF #166 at 15-18 (D. Idaho, Oct. 2, 2009); *Great Old Broads for Wilderness v. Kempthorne*, 452 F. Supp. 2d 71, 81 (D.D.C. 2006); *W. Watersheds Project v. Jewell*, 56 F. Supp. 3d 1182, 1193 (D. Idaho 2014)); *W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 970 (D. Ariz. 2009).

[7] The USDA began grazing sheep on the Snakey and Kelly Canyon allotments decades before the bighorns were reintroduced in the area in 1976 and 1985. It appears from the record that the Sheep Station opened and domestic sheep grazing began on the allotments sometime between 1919 and 1924.

not jeopardize the viability of the bighorn population Forest-wide. *See W. Watersheds Project v. BLM*, No. 4:07-cv-151-BLW, ECF #166 at 15-18 (D. Idaho, Oct. 2, 2009) (where a threat to one bighorn population was a threat to all populations in the forest). In contrast, the Forest Service alleges the Sheep Station stands to lose years of valuable research and associated resources should the Court enjoin grazing during the 2017-2018 fall and winter season, which lasts for six weeks beginning on November 21, 2017.[8]

## FACTUAL BACKGROUND

*The U.S. Sheep Experiment Station*

The Sheep Station has been using the Snakey and Kelly Canyon allotments in the Caribou-Targhee National Forest to graze domestic sheep since approximately 1924. (Dkt. 19-1 at 4.) The allotments "provide a winter rangeland habitat that is representative of rangelands" used by a large section of the U.S. sheep industry. (Dkt. 19-1.) As such, according to the Sheep Station, the allotments offer the necessary environmental variables to successfully conduct various research projects related to studying the ecology of respiratory disease caused by the presence of the respiratory microbial floral called "*Mycoplasma ovipneumoniae*" in domestic sheep under rangeland conditions. The Sheep Station's current research is also aimed at increasing meat and wool quality in domestic sheep.

---

[8] The Complaint states the grazing periods authorized by the permit are as follows: For Snakey Canyon, November 6, 2017 to January 2, 2018; and for Kelly Canyon November 20 to January 3, 2018. (Dkt. 1.) These date ranges comport with the 2017 Temporary Grazing or Livestock Use Permit. (Dkt. 9-4.)

The Forest Service asserts that the success of the Sheep Station's research requires an "annually-repeated grazing strategy, where the sheep graze the same properties each season within each year," and management of sheep in "an extensive rangeland-type system" is essential to success of this current research. (Taylor Dec., Dkt. 19-1 at 5.) According to the Sheep Station, the goal of the research involving domestic sheep grazed on the allotments "is to develop and release genetic lines of sheep that produce safe and premium products for the consumer, while minimizing the use of natural resources and eliminating negative impacts to the landscape or wildlife." *Id.*

Although the Sheep Station maintains management ownership of the genetics of the sheep it has developed through its research, the University of Idaho owns the animals. The University of Idaho also employs the sheep herders who watch and care for the grazing sheep.

The number of domestic sheep grazed on the allotments has varied over the years.[9] For the 2017 fall and 2018 winter grazing season, the Sheep Station plans on turning out a herd of 720 domestic sheep on the Snakey Canyon allotment. This herd will be monitored by one sheep herder. The Sheep Station plans on turning out a herd of 450 sheep on the Kelly Canyon allotment. This herd will be monitored also by one herder. Each herd will graze from November 21, 2017, through the first few days of January 2018 (*see supra* note 9). The total number proposed to be grazed on the allotments this

---

[9] The data for the past four years provides the example: In 2013, 371 sheep were grazed in Kelly and 737 in Snakey; in 2014, 399 sheep were grazed in Kelly and 540 in Snakey; in 2015, 388 sheep were grazed in Kelly and 388 were grazed in Snakey; and in 2016, 563 sheep were grazed in Kelly and 469 in Snakey. (Dkt. 9-22 at 2.)

season is 1,170. Notably, according to the Sheep Station, all of the sheep except 315 are sheep that are in their final year of five-year research studies. The Sheep Station claims the efficacy of these five-year studies is dependent on those 855 sheep in the last study year being grazed on the allotments this season and that the "final year is critical for maintaining a statistically valid replication across years." (Taylor Dec., Dkt. 19-1 at 7.)

Rocky Mountain bighorn sheep also have a storied history in the area. Bighorn sheep are a native species of the Intermountain West. The former range of the type of bighorn sheep found in Idaho, *Ovis Canadensis*, extended from the Northern Rocky Mountains in Canada to Mexico and Baja, California.[10] However, many of the herds were extirpated by the early 1900s as a result of indiscriminate hunting, disease, and loss of habitat. (Idaho Department of Fish and Game, FY2015/FY2016 Statewide Report, Bighorn Sheep, Dkt. 19-6 at 72.)

The bighorn populations that exist in Idaho today are by and large the result of reintroduction (translocation) efforts throughout the 1970s and 1980s. The South Beaverhead herd is the result of reintroduction efforts in 1976 and 1985, which placed a total of 41 bighorns in the area. The herds' size has varied throughout the years, but has remained low in number.[11] At last count, in 2016, the herd consisted of 36 bighorn sheep.

---

[10] U.S. FOREST SERVICE, *Index of Species Information, Wildlife Species: Ovis canadensis* https://www.fs.fed.us/database/feis/animals/mammal/ovca/all.html (last visited Nov. 11, 2017) (Court's Exhibit 2).

[11] Data regarding the South Beaverhead population is limited. The count data has been collected as a part of annual counts focused on other animals (such as elk for instance) as performed by IDFG. The population data that does exist includes the following (year: number of bighorns counted): 2002: 26; 2005: 17; 2007: 30; 2014: 13; 2016: 36. (Dkt. 19-6 at 75.)

According to bighorn experts, the definition of a "viable" bighorn population is a herd of 100 or more animals. The Idaho Department of Fish and Game ("IDFG") estimates that the area where the South Beaverhead herd is located is habitat suited to support a bighorn population of 261 animals. (Dkt. 19-6 at 14.) It has been suggested that populations below 30 bighorns have a high-likelihood of extirpation, "and the recovery of populations at or below this number is unlikely without management intervention." (Bighorn Sheep Risk Assessment for Region 4 National Forests, Dkt. 9-15 at 4.)

The small herd size makes the South Beaverhead population especially vulnerable to die-offs caused by disease. Bighorn sheep are particularly susceptible to transmission of pneumonia pathogens commonly carried by domestic sheep asymptomatically. Transmission occurs through direct contact and aerosolization (dispersal through air). Researchers have identified the *Mycoplasma ovipneumoniae* bacteria as the pathogen "most strongly supported as a primary causal agent of pneumonia in bighorn sheep." (Dkt. 4-3 at 3.) This is the exact bacteria strain being studied in some of the sheep grazed on the allotments.

When domestic sheep introduce the pathogen to bighorn sheep populations, outbreaks of pneumonia may occur, which can result in high mortality rates in the infected herd. Bighorns that survive an outbreak are resistant to the disease. However, the resistance does not pass to offspring, resulting in pneumonia-induced mortality in the survivors' lambs. Additionally, "[t]here is a legitimate concern over the ability of small populations [of bighorns] to sustain disease events, particularly when domestic sheep are in close proximity to [bighorn sheep] populations." (Dkt. 9-15 at 4.) According to the

2015 Bighorn Risk Assessment for Region 4 National Forests, analyses show that the distance between a bighorn herd and the nearest domestic sheep "is a significant predictor of pneumonia-induced die-off and translocation success." (Dkt. 9-15 at 5 (*internal citations omitted*)).

In 2010, the Forest Service published its final EIS for the Boise, Payette and Sawtooth National Forests. (Dkt. 9-1.) Within the EIS, the Forest Service explained the relationship between the bighorn sheep, domestic sheep, contact, and die-off events:

> A long history of large-scale, rapid, all-age die-offs in bighorn sheep exists across Canada and the United States, many associated with domestic animal contact. Although limited knowledge of transmission dynamics exists, extensive scientific literature supports the relationship between disease in bighorn sheep populations and contact with domestic sheep, including both circumstantial evidence linking bighorn die-offs in the wild to contact with domestic animals and controlled experiments where healthy bighorn sheep exposed to domestic sheep displayed subsequently high mortality rates. Recent serological analyses document the lethality of pathogens in bighorn sheep that are not lethal to domestic sheep, and the transference of pathogens from domestic sheep to bighorn sheep that result in bighorn sheep mortality.

U.S. Department of Agriculture, Forest Service, Intermountain Region, *Final Supplemental Environmental Impact Statement, Boise, Payette and Sawtooth National Forests* (July 2010). (Dkt. 9-1 at 6.)

The gregarious nature of both bighorn sheep and domestic sheep increases the chances of disease transmission between the species and between different herds of bighorns. During the fall and winter, bighorn sheep typically head to locations below

about 10,800 feet.[12] And rams "often venture onto more open slopes, although rugged terrain is always nearby."[13] These ventures are known as "forays" and are important to understanding the potential range of movement bighorns may make throughout any given environment and the potential for contact with domestic sheep. Forays are "defined as occasional long-distance exploratory movements from and returning to [the bighorn] core herd home ranges […]." (Dkt. 9-15 at 3.) Most bighorn ram forays end at around 26 kilometers (16.2 miles). (Dkt. 9-2 at 19.)

The information in the record regarding forays by rams in the South Beaverhead herd comes from the telemetry data gathered by IDFG from 2011 through 2015. IDFG radio-collared eight bighorn sheep from the herd: five rams and three ewes. In 2015, one of the collared rams, number 14668, made forays nearby the allotments and into the Snakey Canyon allotment from November 17 through 20. (Dkt. 9-21 at 2.)

The Snakey and Kelly Canyon allotments are contiguous—there is no dividing line such as a river or mountain range, just a division drawn on a map. Based on a ruled map of the area (Dkts. 6-1 and 6-2.) and other evidence in the record, it appears the straight-line distance between the South Beaverhead population's core herd home range and the allotments is approximately 10 to 12 miles.

Further, in a 2016 draft risk of contact analysis for bighorn sheep in Idaho, the Forest Service identified the Snakey and Kelly Canyon allotments as overlapping with

---

[12] U.S. FOREST SERVICE, *Index of Species Information, Wildlife Species: Ovis canadensis* https://www.fs.fed.us/database/feis/animals/mammal/ovca/all.html (last visited Nov. 11, 2017) (Court's Exhibit 2).

[13] *Id.*

the core herd home range of the South Beaverhead population. Thus, the Forest Service's draft risk of contact analysis indicates high probability that bighorn sheep will move in and throughout the allotment area where the domestic sheep grazing occurs.

C. *The 2017 Grazing Authorization*

The Forest Service issues a temporary grazing permit to ARS for the Snakey and Kelly Canyon allotments each grazing season as authorized by the interagency agreement. The permit related to this litigation was issued in June of 2017. The 2017 permit authorizes ARS to graze 1,000 dry ewes[14] on the Kelly Canyon allotment from November 20, 2017, through January 3, 2018, and 1,200 dry ewes on the Snakey Canyon allotment from November 6, 2017, through January 2, 2017. [15]

The Federal Land Policy and Management Act of 1976 (FLPMA), allows the Forest Service to authorize grazing like this on National Forest System ("NFS") land. NFS land is divided into allotments. Grazing is authorized on an allotment basis. To authorize and manage such grazing, the Forest Service must issue a grazing permit, an allotment management plan, and Annual Operating Instructions ("AOIs").

The permit grants the license to graze and establishes the amount of livestock, kind of livestock, and period of use. 36 C.F.R. §§ 222.1-222.4; 43 U.S.C. § 1752. The management plan must be consistent with the applicable Forest Plan. It specifies a program to meet the multiple uses of an allotment and other needs and objectives—

---

[14] A dry ewe is a female sheep of breeding age without lambs. THE FREE DICTIONARY, *Medical Dictionary*, https://medical-dictionary.thefreedictionary.com/dry+ewe (last visited Nov. 20, 2017).

[15] The Forest Service agreed to modify both turn-out dates to November 21, 2017 due to Plaintiff's motion.

including those related to grazing. 36 C.F.R. § 222.1(b); 43 U.S.C. §§ 1702(k)(1), 1752(d). Finally, the AOIs, issued on an annual basis, contain the long-term directives of the management plan to permittees and governs the permit holder's operations for the next year or grazing term. The AOIs related to this litigation were issued in September of 2017. (Dkt. 9-25.)

### D. Best Management Practices

AOIs include what are known as Best Management Practices ("BMPs"), which are procedures designed to reduce the risk of contact between wild bighorn sheep and domestic sheep. "Limiting contact with domestic sheep … is the primary strategy for preventing disease emergence in bighorn sheep."[16] (Dkt. 4-3 at 2.) In large part, the BMPs are instructions for herders and those managing and training the herders to avoid contact between the two sheep species.[17] BMPs are not protocols supported by scientific peer-reviewed studies. Instead, they are on-the-ground solutions developed to decrease the risk of contact between grazing domestic sheep and bighorns. Many parties, including the Plaintiffs in this matter, question the effectiveness of BMPs—especially in certain conditions, such as winter where day-light hours are limited and weather can further reduce visibility.

---

[16] Cassirer et al., *Evidence for Strain-Specific Immunity to Pneumonia in Bighorn Sheep*, Journal of Wildlife Management (*citing* Western Association of Fish and Wildlife Agencies Wild Sheep Working Group 2012, the Wildlife Society 2015).

[17] A list of BMPs included in the 2017 AOIs can be found in the Declaration of Robert Mickelsen. (Dkt. 19-2 at 4-5.) The 2017 AOIs are found at Dkt. 9-25 at 4-5.

In addition to the BMPs required by the AOIs, the Sheep Research station has implemented additional BMPs, which include: (1) requiring the presence of a herder with the sheep 24 hours a day, seven days a week; (2) placing black sheep within the white domestic sheep herd to assist in counting and accounting for all of the domestic sheep; and (3) requiring the herder to count the entire herd three times a week. (Dkt. 19-2 at 5).

Factors that may affect the efficacy of BMPs include: topography, bighorn sheep source habitat connectivity, bighorn sheep population size, proximity of bighorn sheep populations to domestic sheep grazing allotments, timing of allotment use, density of vegetation, and escape terrain. (*See* Dkt. 4-1 at 7.) Another factor contributing to the success or failure of BMPs is the gregarious nature of both species—when in close proximity, i.e. grazing the same habitat, they are likely to seek each other out.

The successful implementation of BMPs by the Sheep Station has been called into question by WWP and Guardians. According to Plaintiffs, "the Sheep Station has a history of failing to ensure domestic sheep are only grazed at authorized times in authorized areas."[18] (Dkt. 5 at 9.)

### E. The 2013 Settlement Agreement

In 2010, WWP and others sued the Forest Service for reauthorizing livestock grazing on federal land without conducting the proper environmental review under

---

[18] Mr. Walter's declaration alleges the Sheep Station left domestic sheep on the range after the grazing season was over and that reports from neighbors document that eight ewes survived the winter and each gave birth to two lambs, which resulted in at least 24 strays left on the allotments. He alleges also that the herders employed by the Sheep Station are unreliable in their reports to the Forest Service concerning potential contact between the bighorn population and domestic sheep during the grazing season. (Dkt. 5.)

NEPA. *W. Watersheds Project v. U.S. Forest Serv.*, No, 4:10-CV-00612-ELJ-REB, Dkt.

1 (D. Idaho 2010). The lawsuit challenged three grazing decisions that covered a total of

35 allotments. One of the decisions was called the "Kelly Canyon/Snakey Canyon CE."

"CE" stands for a "categorical exclusion" under FLPMA section 1752(h).

The lawsuit was resolved when the parties entered into a settlement agreement on

October 31, 2013. (Dkt. 109-1.) The Forest Service agreed to issue new grazing decisions

for nine allotments, including the Snakey and Kelly Canyon allotments. The Forest

Service agreed the decisions would be supported by an EA or an EIS. The Forest Service

deadline to issue scoping notices, which marks the initiation of the NEPA process, was in

April of 2015 for both allotments. The EIS for the allotments has not been completed as

of the date of this opinion. There are several provisions of the settlement agreement that

may be applicable to the resolution of this matter. The Forest Service raises paragraph 4

as an affirmative defense to WWP's NEPA claim:

> Pending completion of the new environmental analysis and decision-
> making processes, grazing may continue to occur on the allotments at
> issue under the terms and conditions of the existing grazing permits,
> and the challenged CE decisions will remain in effect.

*W. Watersheds Project v. U.S. Forest Serv.*, No. 4:10-CV-00612-EJL-REB, ECF No.

109-1 at 5.

Plaintiffs argue the Forest Service has overstated the effect of paragraph 4 and the

intent of the settlement agreement. Plaintiffs assert they agreed in 2013 that grazing could

continue under the terms and conditions of the *then-existing* grazing permits pending

NEPA analysis. (Dkt. 25 at 6 n. 3.) Plaintiffs allege the then-existing permits expired, and

paragraph 4 does not apply to the 2017 permit or the AOIs.[19] Plaintiffs further allege the

Forest Service breached the settlement agreement by failing to provide required status

reports. That provision is found in paragraph 6:

> The Forest Service will provide a written summary to Plaintiffs and Intervenors every six months, briefly describing the status of the environmental analyses described in Paragraph 2. Following receipt of the written summary, Plaintiffs and/or Intervenors may request an in-person meeting with Forest Service representatives to discuss the progress made toward completion of each decision. This meeting will be open to the public.

*W. Watersheds Project v. U.S. Forest Serv.*, No. 4:10-CV-00612-EJL-REB, ECF No.

109-1 at 5.

The Forest Service asserted in its response that, in addition to paragraph 4

precluding WWP's NEPA claims, WWP failed to meet and confer to resolve any

conflicts, as further required by paragraph 6.[20] It is against this backdrop that Plaintiffs

filed their Complaint (Dkt. 1), and the motion presently before the Court.

---

[19] Although the Plaintiffs did not specifically mention them, paragraphs 13 and 14 of the settlement agreement may also have some bearing on the Court's determination of the viability of WWP's challenge in light of paragraph 4:

> 13. The obligations in this Settlement Agreement terminate for each grazing allotment described in Paragraph 2 for which additional environmental analysis will be conducted upon issuance of a new decision to graze or not to graze the allotment.

> 14. This Settlement Agreement requires the Forest Service to fulfill only the commitments specified within this agreement and does not limit its authority with regard to the substantive outcome of any decision. Plaintiffs do not waive their ability to challenge the decisions made by the Forest Service pursuant to Paragraphs 1-3, and the Forest Service does not waive any applicable defenses.

[20] Paragraph 6 reads as follows:

> In the event of a dispute arising out of or relating to this Settlement Agreement, or in the event that either party believes that the other party has failed to comply with any term or condition of this Settlement Agreement, the party raising the dispute or seeking enforcement shall provide the other party with notice of the claim. The Parties agree that they will meet and confer (either telephonically

# ANALYSIS

As an initial matter, the Court finds the Forest Service has raised significant questions regarding the likelihood of success on the merits of Plaintiffs' first claim for relief, the NEPA claim, because of the potential applicability of the 2013 settlement agreement and the FLPMA appropriations riders. In regard to the settlement agreement, the Court first notes that, because Guardians was not a party, even if the settlement agreement is determined to bar WWP's NEPA claim, it would not act to preclude Guardians' NEPA claim. Additionally, without further information, the Court cannot sufficiently assess the likelihood of success on the NEPA claim at this stage. The parties have raised questions as to the intent of the settlement agreement and alleged potential breaches of the agreement. As such, the Court will not address the potential impact of the FLPMA riders on the NEPA claim at this time. These issues will be taken up in the course of the litigation.

The Court does find, however, that the Plaintiffs' NFMA claim is likely to succeed on the merits, that there is a likelihood of irreparable harm if the grazing proceeds, that the balance of harm clearly tips in favor of the Plaintiffs, and that an injunction is in the public interest. Each of these findings is explained below.

---

or in-person) at the earliest possible time in a good faith effort to resolve any requests, disputes or claims before seeking further relief. If the Parties are unable to resolve the request, dispute or claim themselves within 60 days of the receipt of the notice of a request, dispute or claim or such longer time to which they agree, then the Parties may seek relief from this Court. (ECF No. 109-1.)

### A. *Likelihood of Success on the Merits*

Plaintiffs' strongest argument on the merits is that the Forest Service violated NFMA and its corresponding regulations. First, the 2017 renewal of the interagency agreement between the Forest Service and ARS likely presented an "opportunity" to close the allotments as directed by the Forest Plan. Second, the Forest Service likely violated the Forest Plan and its own management directives by authorizing domestic sheep grazing that threatens the viability of a population of bighorns in the Forest.

#### i. *Renewal of the Interagency Agreement*

The Forest Plan requires the Forest Service to close the Snakey and Kelly Canyon allotments on an "opportunity basis." The Forest Service asserts that nothing had changed on the ground that would rise to the level of an opportunity to close the allotments to domestic sheep grazing prior to the execution of the new interagency agreement with ARS.[21] However, the Court finds there are serious questions regarding whether the decision to renew the interagency agreement was an opportunity to protect resources under the Forest Plan, which states:

> To better manage bighorn sheep habitat, the Kelly Canyon and Snakey Canyon winter sheep allotments… will be phased out on an opportunity basis… *An opportunity is defined as a suitable or favorable time to abolish or close an allotment because of* nonuse violations, term permit waivers where the permit is waived back to the government, *resource protection*, or permit actions resulting in cancellation of the permit. If opportunities do not arise, then efforts

---

[21] The Forest Service asserts it relied on available data and that the use of the allotments is explicitly described in the Sheep Station's EIS. (Second Taylor Declaration, Dkt. 26-1 at 5.) However, the Court notes that when an environmental analysis is required under NEPA/NFMA, the Forest Service must perform its own analysis and cannot rely on an EIS completed by another entity to support Forest Service final actions, such as authorizing grazing on NPS land.

will be made to relocate or accommodate the sheep to other areas. When all winter sheep allotments in that portion of the subsection have been vacated, the will be closed. The intent of closing these individual allotments as they become vacated is to provide an opportunity to minimize conflicts between domestic and bighorn sheep.

United States Department of Agriculture, Forest Service, Intermountain Region, 1997 Revised Forest Plan, Targhee National Forest, III-40 (April 1997) ("Forest Plan"). (Dkt. 19-8 at 35.)

The Forest Service asserts that the 2017 renewal of the interagency agreement, approximately two months after the expiration of the 2016 agreement, did not constitute an opportunity to close the Snakey and Kelly Canyon allotments because nothing on the ground had changed since the last agreement was put in place. The Court acknowledges that may be true. However, the Court notes that, although the situation on the land was potentially the same as it had been for years, things had changed: the Forest Service was in the process of conducting its own environmental analysis of the effects of domestic sheep grazing, and it had new telemetry data showing rams from the South Beaverhead population could and do make forays near and into the allotments.

The Court concludes this and other new information and guidance, such as the 2015 Region 4 Bighorn Risk Assessment, amounted to changes that reasonably could have been identified as an opportunity, along with expiration of the interagency agreement, to close the allotments based on the objective of resource protection—at least pending completion of the EIS, which is underway.

## ii. Ensuring for Viable Populations of Sensitive Species

The Forest Plan directs the Forest Service to maintain "at least viable populations of all native and desired nonnative wildlife… in habitats distributed throughout their geographic range on National Forest System lands." (Forest Plan, Fish and Wildlife, 2602 Dkt. 19-8.)  According to both Plaintiffs' and Defendant's experts, a viable population of bighorns is a herd of more than 100 animals. It is clear the South Beaverhead population is not viable at this time. However, it is also clear from the record that the area where the South Beaverhead herd is located provides proper habitat to support a viable population of more than 250 bighorn sheep.

The Forest Service asserts it is in compliance with the Forest Plan requirement to *maintain* viable populations of sensitive species *throughout the Forest*. It argues that, because the South Beaverhead population is not viable, it does not matter, under the Forest Plan, if it is extirpated—i.e. the risk of extirpation does not violate the Forest Plan. In other words, the Forest Service asks the court to the measure the Forest Plan's maintenance requirement not herd-by-herd, but by considering the sum of all of the individual bighorn populations Forest-wide. The sum would necessarily include the South Bighorn population—unless or until they are extirpated. This circular logic is untenable.

The meaning of "maintain" underscores the Court's point. The Oxford English Dictionary contains numerous definitions for maintain, including: "to sustain (life) by nourishment," "to keep up, preserve, cause to continue in being (a state of things, a condition, an activity, etc.); to keep vigorous, effective, or unimpaired; to guard from loss

or deterioration."[22] Thus, in no way do the common definitions and understandings support neglect or deterioration of a population of animals (taken as a whole, or in part) that the Forest Service is mandated to maintain.

Layered on top of the mandate of maintaining viable populations of all desired native or non-native[23] wildlife, are the requirements related to sensitive species. Bighorn sheep are currently designated as a sensitive species in National Forests in the Intermountain region, including the Caribou-Targhee National Forest. (Dkt. 19-5 at 3.) With regard to sensitive species, the Forest Plan directs the Forest Service to "develop and implement management practices to ensure that species do not become threatened or endangered because of Forest Service actions." (Forest plan, Sensitive Species, 2670.22, Dkt. 19-8.)

By authorizing domestic sheep grazing on the allotments, the Forest Service risks extirpation of a herd, albeit small, of sensitive species. This is an action that threatens the herd, and to the Forest Service's point, potentially will diminish the overall population of bighorn sheep throughout the Forest. For these reasons and those above regarding the

---

[22] OXFORD ENGLISH DICTIONARY, *maintain* http://www.oed.com/view/Entry/112562?rskey=4s WBAt&result=2&isAdvanced=false#eid (last visited Nov. 20, 2017) (Court's Exhibit 4).

[23] Defendants attempt to distinguish this Court's October 2009 decision in *W. Watersheds Project v. Bureau of Land Mgmt.* from the case at hand, arguing there the Court was concerned about the threat posed to the only remaining truly native bighorn herd in Idaho. There, Chief District Judge B. Lynn Winmill enjoined grazing on Bureau of Land Management land near the Payette National Forest. No. CIV. 09-0507-E-BLW, 2009 WL 3335365 (D. Idaho Oct. 14, 2009). The Court concluded that, if exposed to the pneumonia pathogens it was highly likely that reintroduced bighorns could infect not only their immediate companions but the native herd far up the Salmon River drainage. The Court is not convinced that whether the potentially affected bighorns are the last remaining native herd, or are reintroduced animals of the same genus and species, changes the nature of the Forest Service's obligations under NFMA and other applicable laws.

Forest Service's missed opportunity to close the allotments, the Court concludes Plaintiffs have shown a likelihood of success on their NFMA claim.

## B. Likelihood of Irreparable Harm

The Forest Service argues Plaintiffs failed to show likelihood of irreparable harm, asserting that the acknowledged *possibility* that bighorns could be exposed to disease pathogens from domestic sheep has not been shown to be *likely*.

In 2011, the Forest Service's deputy chief provided direction on managing bighorn sheep that are in close proximity to domestic sheep grazing allotments: "Where management objectives include maintenance or enhancement of bighorn sheep populations, the potential for disease transmission from domestic sheep … to bighorn sheep must be addressed. To meet these objectives, forests must conduct a bighorn sheep risk assessment." (Dkt. 9-15 at 6.)[24] Region 4 produced a bighorn risk assessment in 2015. (Dkt. 19-5.) The Region 4 risk assessment included guidance for the viable population and risk assessment process. (Dkt. 19-5 at 8.) The guidance concluded, "[b]ighorn sheep herd proximity to active domestic sheep allotments supplies a direct measure for interspecies separation," and a risk of contact model "estimates more directly relevant rates of contact between [bighorn sheep] and domestic sheep allotments." The document also indicated that "distance from a [bighorn sheep] herd to the nearest domestic sheep is a significant predictor of pneumonia-induced die-off."

---

[24] U.S. Department of Agriculture, Forest Service, 2011. Bighorn Sheep Analysis foe NEPA Documents Letter from Washington Office to Regional Foresters in Regions 1, 2, 3, 4, 5, and 6. Signed by Deputy Director James Pena, Deputy Chief, Forest System. Aug. 12, 2011.

Thus, although the Forest Service posits likelihood of irreparable harm cannot be shown by the available, admittedly scant evidence of contact or potential contact, the Court finds the Forest Service's own guidance points to the evidence of risk of irreparable harm in this case: proximity. It is the proximity between the domestic sheep grazed on the Snakey and Kelly Canyon allotments to the South Beaverhead population that demonstrates likelihood of irreparable harm. Even with flawless execution of BMPs,[25] there is no way the Sheep Station or Forest Service can ensure that domestic sheep will not wander, and that South Beaverhead rams will not make forays on or near the allotments while the large herds of domestic sheep are grazing.

The risk in this case is created by the proximity of the two groups of animals. The Forest Service prepared a draft risk of contact analysis for Idaho bighorn sheep in 2016. Therein, it identified the Snakey and Kelly Canyon allotments as overlapping core herd home range. Thus, the allotments pose a high risk for disease transmission from domestic sheep to the South Beaverhead herd.

And, because bighorn sheep are highly susceptible to the pathogens the domestic sheep are known to carry—pathogens being studied in the domestic sheep—the risk

---

[25] During the hearing, the Court asked the Forest Service if BMPs are supported by science that confirms their effectiveness. Defendants answered in the negative. This question was prompted by the same concern discussed in *W. Watersheds Project v. Bureau of Land Mgmt.* There, the Court stated: "The record must reveal that the IDFG and the BLM went further than the language of the statute and set in place BMPs that had some science behind them. The present record—obviously thin on a motion for TRO—shows no supporting science for the BMPs." No. CIV. 09-0507-E-BLW, 2009 WL 3335365, at *7 (D. Idaho Oct. 14, 2009). Here, the Forest Service argues that BMPs are more effective on open landscapes, like the Snakey and Kelly Canyon allotments, than they are in forested areas of the type at issue in the 2009 case. Plaintiffs respond that, although the landscapes are different, there is no scientific evidence supporting their effectiveness in either landscape scenario. As in the 2009 case, the present record contains no supporting science for the BMPs on more open landscapes.

increases. Finally, as with cases before this, the risk to the bighorns is potentially

catastrophic and could affect the other nearby herds. For these reasons, the Court finds

the risk of irreparable harm likely, assuming continued domestic sheep grazing activity

on the allotments during the pendency of this litigation.

### C. *Balance of Hardships*

With regard to balancing the hardships, the Forest Service asserts the viability of

the research studies in their fifth and final year will be compromised if grazing is

enjoined on the allotments. The hardship involved to the Sheep Station would be to

quickly locate alternative land with the same environmental variables to graze the sheep

this season.

During the hearing, the Sheep Station asserted that only 314 of the total 1,170

domestic sheep to be grazed this season *are not* a part of the group of sheep that are in

their fifth year of a study. This information prompted the Court to begin counting sheep.

By the Court's count, 855 domestic sheep have been in the five-year studies. Yet

other evidence before the Court suggests that this group of 855 sheep have not been

consistently grazed on the allotments for the past four seasons. For example, according to

the Forest Service, in 2015, 338 sheep were grazed on the Snakey Canyon allotment and

388 were grazed on the Kelly Canyon allotment—totaling 776 sheep. This figure is 79

sheep shy of the 855 that are cited to be part of the five-year studies.

Information presented in the Forest Service's sur reply sheds light on the question

that arises from this calculation. (Dkt. 26.) The Forest Service asserts the reduction in

grazing on the allotments in 2015 was due to the Sheep Station's ability to utilize winter

range on ARS land to graze some of the sheep. This fact indicates several things to the Court: grazing on the specific allotments is not critical to either the integrity or the success of the studies, and at a minimum, some of the sheep can be grazed on the suitable ARS land. Additionally, the Court notes the Sheep Station has, in the past, been unable to graze the sheep on the allotments once a snow pack forms—indicating that grazing of the studied sheep may be interrupted or prevented by a common weather event.

Therefore, the Court finds the potential harm or risk of extirpation to the South Beaverhead herd, as well as the potential effects of disease transmission to the North Beaverhead herd and other nearby herds, significantly outweighs the hardship of finding alternative suitable land to graze the domestic sheep pending the outcome of this litigation.

### D. The Public Interest

Considering the public interest in a case such as this—the public's enjoyment of National Forest lands and enjoyment of sensitive, iconic species such as bighorn sheep— is a significant interest. The efforts undertaken to restore bighorn sheep to their native habitats have been significant, ongoing, and costly. On the other hand, the public and the commercial sheep industry also have an economic interest in the outcome of the Sheep Station's research. In this case, the Court finds the balance clearly tips in favor of the public interest in preserving the iconic Rocky Mountain bighorn sheep and the viability of the South Beaverhead population, given the potential for extirpation verses the short-term burden of finding an alternate grazing location and the minimal effect this will have

on the potential benefit from the ongoing research for the public and the commercial sheep industry as a whole.

## CONCLUSION

Plaintiffs have established a likelihood of irreparable injury to the bighorn population in this region of the Forest if grazing is allowed during the six-week grazing season. Plaintiffs have established also their NFMA claim is likely to succeed. The balance of the hardships additionally tips in favor of the Plaintiffs. And, finally, the public interest favors the issuance of a preliminary injunction.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiffs' motion for Preliminary Injunction (Dkt. 3) is **GRANTED**. The Forest Service and all persons operating on its behalf, the employees of the U.S. Sheep Experiment Station and all persons operating on its behalf, and the employees of Agricultural Research Service and all persons operating on its behalf, are hereby enjoined from proceeding with the grazing of domestic sheep on the Snakey and Kelly Canyon allotments during the scheduled six-week 2017/2018 fall and winter grazing season.

Dated: **November 20, 2017**

Honorable Candy W. Dale
United States Magistrate Judge